**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KEVIN McMANAMAN,<br><br>Defendant. | No. CR08-4025-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

On March 25, 2008, the grand jury returned a seven-count Indictment against the defendant Kevin McManaman and codefendant Justin Watterson. McManaman is charged in Count 1 with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2; in Count 2 with distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c), and 846; in Count 3 with trading firearms for drugs in violation of 18 U.S.C. §§ 2 and 924(c)(1); in Count 4 with dealing in stolen firearms in violation of 18 U.S.C. §§ 922(j) and 924(a)(2); in Count 5 with transportation of stolen firearms in violation of 18 U.S.C. § 922(l) and 924(a)(2); and in Count 6 with possession of a firearm by a convicted felon, in violation of 18 U.S.C. and 924(a)(2). Count 7 charges only codefendant Watterson. In addition, both defendants are the subjects of a forfeiture allegation with respect to any firearms involving in or used in knowingly violating 18 U.S.C. §§ 924(c)(1), 922(j), 922(l), 922(g)(1), and 922(g)(9). *See* Doc. No. 3.

On May 15, 2008, McManaman filed a motion to suppress evidence. Doc. No. 31. The plaintiff (the "Government") resisted the motion on May 21, 2008. Doc. No. 33. Pursuant to the trial management order, Doc. No. 11, the court held an evidentiary hearing on the motion on May 30, 2008. Assistant U.S. Attorney Forde Fairchild represented the Government at the hearing. McManaman appeared in person with his attorneys, Stan Munger and Jay Denne.

The Government offered the testimony of ATF Special Agents Zane Dodds and Todd Monney, and Deputy U.S. Marshal Peter Zellmer. McManaman testified in his own behalf, and he also offered the testimony of his wife, Tiny Frye, and his mother, Betty McManaman. Two exhibits were admitted into evidence, to-wit: **Gov't Ex. 1** - a recording of officers' interview with Tina Frye on April 3, 2008, and **Gov't Ex. 2** - a recording of officers' interview with McManaman on April 2, 2008.

On June 4, 2008, McManaman filed a supplemental brief in support of his motion. Doc. No. 36. On June 5, 2008, the Government filed a responsive brief. Doc. No. 37. The motion is now fully submitted, and the undersigned turns to a review of the underlying facts and applicable law relating to McManaman's motion.

## *Discussion*

Sometime before September 2005, law enforcement officers received information that McManaman was involved in trading firearms for drugs. An Amber Christianson told officers she had asked McManaman if he had any guns, and McManaman responded he had two guns in his house that he wanted to get rid of because he was a convicted felon. He told Amber he wanted to exchange the guns for some methamphetamine. When he delivered the guns to Amber, he told her he had gotten the guns from Justin Watterson., who had stolen them from Watterson's grandfather's home. McManaman also told Amber he was with Watterson when the guns were stolen.

Officers interviewed McManaman on or about September 29, 2005, and he signed an affidavit in which he admitted he was a convicted felon and he was in possession of some firearms. Officers interviewed McManaman again on or about November 7, 2005, and at that time, he admitted that he had traded a gun for some drugs. He also told the officers he had disposed of a couple more firearms since his September 2005 interview. Later, officers talked with McManaman again, but the record does not indicate when or

how many times. The last contact officers had with McManaman before his indictment on the current charges (which occurred on March 25, 2008) was on May 18, 2006.

On April 2, 2008, about a week after McManaman was indicted, Agents Monney and Dodds met with officers from several other agencies for a briefing in preparation for McManaman's arrest on the federal arrest warrant issued in connection with his indictment. Officers involved in the briefing included two agents from Immigration and Customs Enforcement, Deputy U.S. Marshal Peter Zellmer, and three officers from the Sioux City Police Department, one of whom was an officer with the Gang Unit. Agent Dodds testified McManaman was not suspected of any gang-related activities or immigration violations, and all of the officers present besides himself and Agent Monney were present for purposes of officer safety. Dodds acknowledged that McManaman had never been threatening or caused problems when officers had spoken with him previously, but the officers were aware that McManaman had a "history of violence" and numerous prior convictions, one of which was a "hate crime."

The officers proceeded to McManaman's residence at approximately 9:00 p.m. on April 2, 2008. They drove past the house but it appeared no one was home. They placed the house under surveillance and headed toward McManaman's mother's residence, thinking he might be there, but before they arrived, the officer watching McManaman's residence called to say McManaman had returned to his residence.

The officers returned to the McManaman residence and took up positions surrounding the house, covering all available exits. Agents Monney and Dodds approached the front door with Deputy Marshal Zellmer and a "breaching tool," which they planned to use if the home's occupants refused to open the door. Agent Monney knocked on the door and McManaman came to the door. When McManaman opened the door, the officers on the porch could see that there were several children in the house, appearing to range in age from a toddler to a teenager. They also could see a great deal

of trash in the house and "stuff everywhere." McManaman's wife, Tina Frye, also came to the door.

Agent Monney asked McManaman if he would step out onto the porch. The officers wanted to avoid placing McManaman under arrest in front of the children, if possible. McManaman complied, and Frye stepped into the doorway. Monney informed McManaman that he had been indicted and they had a warrant for his arrest. He went behind McManaman and began patting him down for weapons. During the pat-down, Monney found a marijuana pipe, a methamphetamine pipe, and a "snort tube" in McManaman's pockets.

The witnesses' hearing testimony differs on the events that occurred on the porch. Agent Dodds testified that while McManaman was being handcuffed, Dodds asked him if there was anything illegal inside the home that the officers should be concerned about. Dodds testified it is his experience that when people are carrying drug paraphernalia, they are likely to have drugs nearby. Based on McManaman's history, they also feared there might be firearms in the house. According to Dodds, McManaman responded to the question by pausing briefly, sighing, and then stating there was a broken-down shotgun in his basement that had belonged to his grandfather. McManaman asked the officers if Frye could retrieve the shotgun, but the officers stated one of them would have to accompany Frye into the house to get the firearm. McManaman told Frye where the shotgun was located. Frye came out on the porch, closed the front door, and then led Dodds around to a door at the back of the house. She opened the door and led Dodds and another officer to the basement, where they retrieved the shotgun.

McManaman first testified that when Dodds asked him the question about whether there was anything illegal in the house, he paused briefly, and then stated there was a shotgun in the basement. He told the officers that the shotgun was broken down into pieces and stored where his children could not get to it. He asked if his wife could retrieve the gun, and, according to McManaman, one of the officers told him they either could send

4

one officer into the house with Frye to retrieve the shotgun, or they would have to bring in a dog and search the house. Later, he changed his testimony, and stated that the officer's comment about bringing in a dog to search the house came earlier in the events. In this version, after Dodds asked McManaman the question about whether there was anything illegal in the house, McManaman paused briefly, but before he could answer further, either Monney or Dodds stated if he did not cooperate and tell them about anything illegal that was in the house, they would send a dog through the house. McManaman also testified that as he was being patted down and handcuffed, one of the officers on the porch asked him, "Where's the meth?" Agents Monney and Dodds both testified on rebuttal that no statements were made during McManaman's arrest concerning bringing a dog into the house. Deputy Marshal Zellmer, who also was on the porch during the arrest, testified he did not hear any statements about a dog.

The officers and McManaman agree that after McManaman stated there was a firearm in the house, Frye led Dodds around the house, opened the door, and Dodds and another officer followed her to the basement to retrieve the firearm. The entire exchange, from the time McManaman was taken into custody until his wife led Dodds around the side of the house, took no more than five minutes. The parties also agree that after his arrest, McManaman was taken to the Woodbury County jail, where he was advised of his rights and then questioned in detail about the allegations in the indictment. During this questioning, he made certain admissions.

Substantial additional testimony was elicited at the hearing concerning whether, and when, Frye may have consented to a search of the residence; what other actions officers took inside the residence when they went in to retrieve the shotgun; and what officers discovered in a subsequent search of the residence. None of these facts are relevant to consideration of McManaman's current motion to suppress. Assistant U.S. Attorney Fairchild represented at the hearing that the only evidence from McManaman's residence

he will offer at trial is the shotgun,[1] although he also will offer into evidence McManaman's admissions when he was questioned later at the jail regarding the charges in the indictment.

Dodds's question to McManaman about whether there was anything illegal in the house came after McManaman was told he was under arrest, and before he was advised of his constitutional rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Because of the recognition that custodial interrogations are inherently coercive, "*Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, 420, 106. S. Ct. 1135, 1140, 89 L. Ed. 2d 410 (1986). Those procedures include fully apprising a suspect of his rights prior to any questioning. *Miranda*, 384 U.S. at 468-70, 86 S. Ct. at 1624-26. The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; *see United States v. Caldwell*, 954 F.2d 496, 499 (8th Cir. 1992).

There is no question that McManaman was in custody at the time he was asked if there was anything illegal in the house. Whether the court chooses to believe McManaman's representation that he was threatened with having a dog brought into his house, or the officers' denial of that representation, the fact that the question was asked and McManaman answered before the *Miranda* warnings were administered violated his Sixth Amendment right to counsel. *See id.*; *Fellers v. United States*, 540 U.S. 519, 124 S. Ct. 1019, 157 L. Ed. 2d 1016; *Oregon v. Elstad*, 470 U.S. 298, 309-10, 105 S. Ct. 1285, 1293, 94 L. Ed. 2d 222 (1985).

---

[1] Notably, the shotgun is not one of the two firearms listed in the indictment.

The Government argues no Sixth Amendment right had attached because McManaman's response about the shotgun referred to "an uncharged offense." This argument misses the point. In *Fellers*, the Supreme Court explained as follows:

> The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams*, 430 U.S. 387, 398, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972)). We have held that an accused is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964); *cf. Patterson, supra* (holding that the Sixth Amendment does not bar postindictment questioning in the absence of counsel if a defendant waives the right to counsel).
>
> We have consistently applied the deliberate-elicitation standard in subsequent Sixth Amendment cases, *see United States v. Henry*, 447 U.S. 264, 270, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980) ("The question here is whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements . . . within the meaning of *Massiah*"); *Brewer, supra*, at 399, 97 S. Ct. 1232 (finding a Sixth Amendment violation where a detective "deliberately and designedly set out to elicit information from [the suspect]"), and we have expressly distinguished this standard from the Fifth Amendment custodial-interrogation standard, *see Michigan v. Jackson*, 475 U.S. 625, 632 n.5, 106 S. Ct. 1404, 89 L. Ed. 2d 631 ("[T]he Sixth Amendment provides a right to counsel . . . even when there is no interrogation and no Fifth Amendment applicability"); *Rhode Island v. Innis*, 446 U.S. 291, 300 n.4, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) ("The definitions of 'interrogation' under the Fifth and Sixth Amendments, if indeed the term 'interrogation' is even apt in the Sixth Amendment context, are not necessarily interchangeable"); *cf. United States v. Wade*, 388 U.S. 218, 87

> S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) (holding that the Sixth
> Amendment provides the right to counsel at a postindictment
> lineup even though the Fifth Amendment is not implicated).

*Fellers*, 540 U.S. at 523-24, 124 S. Ct. at 1022-23.

Agent Dodds's question "deliberately elicited" an incriminating statement from McManaman. The question was asked, and answered, in connection with McManaman's arrest on the current charges. The constitutional violation occurred with the *asking* of the question in the first place, subsequent to the indictment and before McManaman had been advised of his rights and had waived them. Any response to the unconstitutional question must be suppressed regardless of whether it pertains to the charged offense or not. Further, the court finds any consent by McManaman or Frye to officers' entry into the residence to retrieve the shotgun *at the time of McManaman's arrest* was solely due to the constitutional violation.[2]

However, suppression of McManaman's statement in response to the pre-*Miranda* question does not require suppression of the shotgun itself based on the rule of inevitable discovery, even in light of the narrow view of that doctrine taken by the Eighth Circuit Court of Appeals. *See United States v. Warford*, 439 F.3d 836, 844 (8th Cir. 2006) (citing *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). The Eighth Circuit Court of Appeals has explained:

> To succeed under the inevitable-discovery exception to the exclusionary rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation. *United States v. Wilson*, 36 F.3d 1298, 1304 (5th Cir. 1994).

---

[2]The issue currently before the court does not require the court to reach the question of whether Frye consented to a warrantless search of the residence at a later time.

*United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (following the holding in *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)); *but see United States v. Thomas*, 524 F.3d 855 (8th Cir. 2008) (Colloton, J., concurring) (questioning whether the Eighth Circuit test in *Connor* is consistent with *Nix*). In the present case, when McManaman's person was searched incident to his arrest, the officers found drug paraphernalia on his person. This evidence, together with McManaman's history, would have provided probable cause for the officers to obtain a warrant to search the residence, during which the shotgun inevitably would have been discovered.

The Government argues at some length that even without the constitutional violation and McManaman's response to the question about whether there was anything illegal in the house, the officers could have entered the house based on exigent circumstances or the "public safety" exception to the warrant requirement. The court is not persuaded by this argument. The factual circumstances here did not rise to the level of exigency that courts have held allows officers to enter and search a residence without a warrant. Neither was there any need for a protective sweep of the residence. The officers had a warrant for McManaman's arrest. He was outdoors, on the porch, at the time of his arrest, and neither he nor anyone inside the house was causing the officers any resistance or acting in a threatening manner. There was no need for the officers to enter the residence, and constitutionally, they could not do so absent either a warrant or consent. *See United States v. DeBuse*, 289 F.3d 1072, 1074 (8th Cir. 2002).

After McManaman was given the *Miranda* warnings at the Woodbury County jail, he proceeded to make incriminating statements concerning the allegations in the indictment. He asks the court to suppress these statements, but he has made no meaningful argument in support of this request. Suppression of McManaman's statement in response to the question about whether there was anything illegal in the house does not require suppression of his post-*Miranda* statements, made several hours after his arrest, when officers went through each count of the Indictment with him. These incriminating

9

statements were in no respect the fruit of the Sixth Amendment violation that occurred at the time of McManaman's arrest, and should not be suppressed.

For these reasons, the undersigned respectfully recommends that McManaman's motion to suppress be granted as to his statement in response to the question about whether there was anything illegal in the house, but denied as to the statements he made at the Woodbury County jail and as to discovery of the shotgun itself.[3] Objections to this Report and Recommendation must be filed by **June 18, 2008**. Responses to objections must be filed by **June 23, 2008**.

IMPORTANT NOTE: Any party planning to lodge any objection to this report and recommendation must order a transcript of the hearing **by June 12, 2008**, **regardless of whether the party believes a transcript is necessary to argue the objection**. If an attorney files an objection to this report and recommendation without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 9th day of June, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3] When they searched the house, officers allegedly discovered evidence of other serious crimes, and when McManaman was questioned at the jail, he allegedly made incriminating statements concerning these crimes. Whether this evidence would be admissible in a prosecution for these other crimes is beyond the scope of this Report and Recommendation. In fact, it appears the parties' wrangling over whether McManaman or Frye consented to a search of the residence, or whether the shotgun itself should be suppressed, represents much ado about nothing. The shotgun seized during the search of the house is not even one of the firearms mentioned in the Indictment against McManaman.