## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>KEVIN McMANAMAN,<br><br>  Defendant. | No. CR08-4025-MWB<br><br>**ORDER REGARDING MAGISTRATE'S REPORT AND RECOMMENDATION CONCERNING DEFENDANT'S MOTION TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *A. Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *B. Objections To Report and Recommendation* . . . . . . . . . . . . . . . . . . . 12
      *1. Inevitable discovery of the shotgun* . . . . . . . . . . . . . . . . . 12
      *2. Post-Miranda Statements* . . . . . . . . . . . . . . . . . . . . . . . 17

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On March 26, 2008, an indictment was returned against defendant Kevin

McManaman charging him with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2, distribution and attempted distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c), and 846, using and aiding and abetting the use of firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 2 and 924(c)(1), possession of stolen firearms, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2), transportation of stolen firearms, in violation of 18 U.S.C. § 922(l) and 924(a)(2), and being a convicted felon in possession of firearms, in violation of 18 U.S.C. and 924(a)(2). On May 15, 2008, defendant McManaman filed a motion to suppress evidence in which he seeks to suppress statements made shortly after his arrest as well as a shotgun recovered from his home. Defendant McManaman argues that the shotgun was found during a warrantless search of his residence, in violation of the Fourth Amendment of the United States Constitution. Defendant McManaman also argues that any statements made by him should be suppressed because they were obtained in violation of his Fifth And Sixth Amendment rights and were involuntary. The prosecution filed a timely resistance to defendant McManaman's motion.

 Defendant McManaman's motion to suppress was referred to Chief United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). On May 30, 2008, Judge Zoss conducted an evidentiary hearing. On June 9, 2008, Judge Zoss filed a Report and Recommendation in which he recommends that defendant McManaman's motion to suppress be granted in part and denied in part. Judge Zoss concluded that defendant McManaman's Sixth Amendment right to counsel was violated when he was questioned subsequent to his indictment and before defendant McManaman had been advised of his rights and had waived them. Accordingly, Judge Zoss granted defendant McManaman's motion to suppress with respect to defendant McManaman's statement made in response

to pre-*Miranda* questioning. However, Judge Zoss further found that the suppression of defendant McManaman's statement did not require suppression of a shotgun defendant McManaman mentioned in that statement based on the rule of inevitable discovery. Therefore, Judge Zoss denied defendant McManaman's motion to suppress with respect to the shotgun. Finally, Judge Zoss denied defendant McManaman's motion to suppress with respect to post-*Miranda* questioning that occurred several hours after his arrest. Judge Zoss concluded that these statements were in no respect the fruit of the Sixth Amendment violation that occurred at the time of defendant McManaman's arrest, and thus, should not be suppressed. Defendant McManaman has filed objections to Judge Zoss's Report and Recommendation. The prosecution has filed a timely resistance to defendant McManaman's objections. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant McManaman's motion to suppress.

### B. *Factual Background*

In his Report and Recommendation, Judge Zoss made the following findings of fact:

> Sometime before September 2005, law enforcement officers received information that McManaman was involved in trading firearms for drugs. An Amber Christianson told officers she had asked McManaman if he had any guns, and McManaman responded he had two guns in his house that he wanted to get rid of because he was a convicted felon. He told Amber he wanted to exchange the guns for some methamphetamine. When he delivered the guns to Amber, he told her he had gotten the guns from Justin Watterson, who had stolen them from Watterson's grandfather's home. McManaman also told Amber he was with Watterson when the guns were stolen.

3

Officers interviewed McManaman on or about September 29, 2005, and he signed an affidavit in which he admitted he was a convicted felon and he was in possession of some firearms. Officers interviewed McManaman again on or about November 7, 2005, and at that time, he admitted that he had traded a gun for some drugs. He also told the officers he had disposed of a couple more firearms since his September 2005 interview. Later, officers talked with McManaman again, but the record does not indicate when or how many times. The last contact officers had with McManaman before his indictment on the current charges (which occurred on March 25, 2008) was on May 18, 2006.

On April 2, 2008, about a week after McManaman was indicted, Agents Monney and Dodds met with officers from several other agencies for a briefing in preparation for McManaman's arrest on the federal arrest warrant issued in connection with his indictment. Officers involved in the briefing included two agents from Immigration and Customs Enforcement, Deputy U.S. Marshal Peter Zellmer, and three officers from the Sioux City Police Department, one of whom was an officer with the Gang Unit. Agent Dodds testified McManaman was not suspected of any gang-related activities or immigration violations, and all of the officers present besides himself and Agent Monney were present for purposes of officer safety. Dodds acknowledged that McManaman had never been threatening or caused problems when officers had spoken with him previously, but the officers were aware that McManaman had a "history of violence" and numerous prior convictions, one of which was a "hate crime."

The officers proceeded to McManaman's residence at approximately 9:00 p.m. on April 2, 2008. They drove past the house but it appeared no one was home. They placed the house under surveillance and headed toward McManaman's mother's residence, thinking he might be there, but before they arrived, the officer watching McManaman's residence called

4

to say McManaman had returned to his residence.

The officers returned to the McManaman residence and took up positions surrounding the house, covering all available exits. Agents Monney and Dodds approached the front door with Deputy Marshal Zellmer and a "breaching tool," which they planned to use if the home's occupants refused to open the door. Agent Monney knocked on the door and McManaman came to the door. When McManaman opened the door, the officers on the porch could see that there were several children in the house, appearing to range in age from a toddler to a teenager. They also could see a great deal of trash in the house and "stuff everywhere." McManaman's wife, Tina Frye, also came to the door.

Agent Monney asked McManaman if he would step out onto the porch. The officers wanted to avoid placing McManaman under arrest in front of the children, if possible. McManaman complied, and Frye stepped into the doorway. Monney informed McManaman that he had been indicted and they had a warrant for his arrest. He went behind McManaman and began patting him down for weapons. During the pat-down, Monney found a marijuana pipe, a methamphetamine pipe, and a "snort tube" in McManaman's pockets.

The witnesses' hearing testimony differs on the events that occurred on the porch. Agent Dodds testified that while McManaman was being handcuffed, Dodds asked him if there was anything illegal inside the home that the officers should be concerned about. Dodds testified it is his experience that when people are carrying drug paraphernalia, they are likely to have drugs nearby. Based on McManaman's history, they also feared there might be firearms in the house. According to Dodds, McManaman responded to the question by pausing briefly, sighing, and then stating there was a broken-down shotgun in his basement that had belonged to his grandfather.

5

McManaman asked the officers if Frye could retrieve the shotgun, but the officers stated one of them would have to accompany Frye into the house to get the firearm. McManaman told Frye where the shotgun was located. Frye came out on the porch, closed the front door, and then led Dodds around to a door at the back of the house. She opened the door and led Dodds and another officer to the basement, where they retrieved the shotgun.

McManaman first testified that when Dodds asked him the question about whether there was anything illegal in the house, he paused briefly, and then stated there was a shotgun in the basement. He told the officers that the shotgun was broken down into pieces and stored where his children could not get to it. He asked if his wife could retrieve the gun, and, according to McManaman, one of the officers told him they either could send one officer into the house with Frye to retrieve the shotgun, or they would have to bring in a dog and search the house. Later, he changed his testimony, and stated that the officer's comment about bringing in a dog to search the house came earlier in the events. In this version, after Dodds asked McManaman the question about whether there was anything illegal in the house, McManaman paused briefly, but before he could answer further, either Monney or Dodds stated if he did not cooperate and tell them about anything illegal that was in the house, they would send a dog through the house. McManaman also testified that as he was being patted down and handcuffed, one of the officers on the porch asked him, "Where's the methamphetamine?" Agents Monney and Dodds both testified on rebuttal that no statements were made during McManaman's arrest concerning bringing a dog into the house. Deputy Marshal Zellmer, who also was on the porch during the arrest, testified he did not hear any statements about a dog.

The officers and McManaman agree that after McManaman stated there was a firearm in the house, Frye led

>Dodds around the house, opened the door, and Dodds and another officer followed her to the basement to retrieve the firearm. The entire exchange, from the time McManaman was taken into custody until his wife led Dodds around the side of the house, took no more than five minutes. The parties also agree that after his arrest, McManaman was taken to the Woodbury County jail, where he was advised of his rights and then questioned in detail about the allegations in the indictment. During this questioning, he made certain admissions.

Report and Recommendation at pp. 2-5. Upon review of the record, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL ANALYSIS

### A. *Standard Of Review*

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while de novo review generally entails review of an entire matter, in the context of § 636 a district court's *required* de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see*

*Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a de novo review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide de novo review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give de novo review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired,

"[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at

795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[1]

---

[1] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal

(continued…)

As noted above, defendant McManaman has filed objections to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant McManaman's motion to suppress.

### B. *Objections To Report and Recommendation*
#### 1. *Inevitable discovery of the shotgun*

Defendant McManaman objects to Judge Zoss's finding that the suppression of defendant McManaman's pre-*Miranda* warnings statement did not require suppression of a shotgun that defendant McManaman mentioned in that statement and which was found in his residence based on the rule of inevitable discovery.

In *Nix v. Williams*, 467 U.S. 431 (1984), the United States Supreme Court adopted inevitable discovery doctrine as an exception to the exclusionary rule. The Court held that where evidence is discovered after "illegal government activity", the evidence should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means."

---

[1](…continued)
questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed de novo, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions de novo." (citation omitted)).

*Id*. at 444. The Court explained that the rationale underlying the inevitable discovery exception is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Id*. at 443.

Under Eighth Circuit Court of Appeals precedent, to prevail under this exception, the prosecution must establish "'(1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.'" *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)); *accord United States v. Thomas*, 524 F.3d 855, 858 (8th Cir. 2008); *United States v. James*, 353 F.3d 606, 616-17 (8th Cir. 2003); *United States v. Villalba-Alvardo*, 345 F.3d 1007, 1019 (8th Cir. 2003); *United States v. Alvarez-Gonzalez*, 319 F.3d 1070, 1072 (8th Cir. 2003); *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999).[2] In applying the inevitable discovery doctrine, the Eighth Circuit Court of Appeals

---

[2] As Judge Colloton pointed out recently in his concurrence in *Thomas*:

> Most courts of appeals have expressly or implicitly rejected the "substantial, alternative line of investigation" requirement. *See United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998); *United States v. Larsen*, 127 F.3d 984, 987 (10th Cir. 1997); *United States v. Kennedy*, 61 F.3d 494, 499-500 (6th Cir. 1995); *United States v. Fialk*, 5 F.3d 250, 253 (7th Cir. 1993); *United States v. Thomas*, 955 F.2d 207, 210 (4th Cir. 1992); *United States v. Boatwright*, 822 F.2d 862, 864 (9th Cir. 1987) (Kennedy, J.); *United States v.*

(continued…)

has noted that "it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful recovery not occurred." *Villalba-Alvardo*, 345 F.3d at 1019; *see also United States v. Feldhacker*, 849 F.2d 293, 296 (8th Cir. 1988) ("The difficulty with appellants' approach to the inevitable-discovery rule is that it mistakenly focuses on what investigators actually did after the unlawful discovery, rather than what they would have done in the absence of such an illegal disclosure. This inquiry necessarily entails reasoning about hypothetical circumstances contrary to fact.").

Although the court finds this to be an exceedingly close question, the court finds both prongs of the inevitable discovery doctrine are satisfied. With respect to the first prong, it seems certain that the law enforcement officers would have sought a search warrant for defendant McManaman's home upon finding the marijuana pipe and methamphetamine pipe on his person. The more difficult question is whether a neutral magistrate would have issued a warrant based on the information known independently of McManaman's statement about the shotgun. The court concludes that a finding of probable cause is satisfied here and that a neutral magistrate would have issued a search warrant for defendant's home.

For probable cause to exist, a magistrate need not determine that the evidence

---

²(…continued)
    *Silvestri*, 787 F.2d 736, 745-46 (1st Cir. 1986). That prophylactic rule is now followed by only our court, the Eleventh Circuit, and the Fifth Circuit, from which both we and the Eleventh Circuit adopted it. *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004); *Conner*, 127 F.3d at 667; *United States v. Kirk*, 111 F.3d 390, 392 (5th Cir. 1997).

*Thomas*, 524 F.3d at 862 (Colloton, J., concurring).

sought is in fact on the premises to be searched or that the evidence is more likely than not to be found where the search takes place. Rather, the duty of the judge issuing a search warrant is to make a "practical, common-sense decision" whether, considering all the circumstances, a reasonable person would have reason to suspect that evidence would be discovered. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is a "fair probability" that contraband or evidence of a crime will be found in the location to be searched. *See id.*; *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007); *United States v. Stevens*, 439 F.3d 983, 988 (8th Cir. 2006); *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005); *United States v. Gleich*, 397 F.3d 608, 612-13 (8th Cir. 2005); *United States v. Carter*, 413 F.3d 712, 714 (8th Cir. 2005).

Here, the law enforcement officers arresting defendant McManaman found both a marijuana pipe and a methamphetamine pipe on his person. Previously, sometime before September 2005, law enforcement officers had received information that McManaman was involved in trading firearms for drugs. On November 7, 2005, McManaman subsequently admitted to law enforcement officers that he had traded a gun for some drugs. The Eighth Circuit Court of Appeals has previously held that the discovery of drug paraphernalia "in or around a suspect's house is significant on the issue of probable cause." *United States v. Hernandez Leon*, 379 F.3d 1024, 1028 (8th Cir. 2004); *see United States v. Briscoe*, 317 F.3d 906, 908 (8th Cir. 2003) (noting that "[m]any of our cases recognize that the recovery of drugs or drug paraphernalia from the garbage contributes significantly to establishing probable cause."). The facts of this case are on a par with those in *United States v. Reinholz*, 245 F.3d 765, 776-77 (8th Cir. 2001), in which the court of appeals held that an affidavit recounting the discovery of drug paraphernalia with residue in defendants' trash, coupled with the defendant's drug record, established probable cause for a search of the house. Here, the finding of the marijuana and methamphetamine drug

pipes on defendant McManaman's person at his residence when combined with his admitted history of trading drugs for firearms reasonably suggest that consumption of narcotics were occurring within the premises. Moreover, a number of federal courts of appeals have held that evidence of involvement in the drug trade is likely to be found where the drug dealers reside. *See United States v. McClellan*, 165 F.3d 535, 546 (7th Cir.) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept . . . . and . . . in the case of drug dealers evidence is likely to be found where the dealers live.") (quoting *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir. 1996) (internal quotations and citations omitted)), *cert. denied*, 526 U.S. 1125 (1999); *United States v. Henson*, 123 F.3d 1226, 1239 (9th Cir. 1997) ("In the case of drug dealers, evidence is likely to be found where the dealers live.") (internal quotation omitted); *see also United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999) (holding that it was reasonable to suppose that drug dealer stored evidence of dealing at home, even though no drug trafficking was observed to occur there); *United States v. Luloff*, 15 F.3d 763, 768 (8th Cir. 1994) (ruling that observations of drug trafficking occurring away from the dealer's residence, coupled with officer's statement in his affidavit that drug dealers often store evidence of drug dealing in their residences, provided probable cause for search of dealer's house). Thus, the court concludes that the evidence of the drug paraphernalia found on defendant McManaman's person, when combined with his drug history, would have provided probable cause for the officers to obtain a warrant to search his residence, during which the shotgun inevitably would have been discovered.

The second prong of the doctrine is also established. Apart from arresting defendant McManaman on an arrest warrant, upon finding drug paraphernalia on his person, the officers were engaged in ascertaining defendant McManaman's current involvement with drugs. The court finds such substantial, alternative line of investigation

satisfies the test in this case. *See Thomas*, 524 F.3d at 858. The court, therefore, overrules this objection to Judge Zoss's Report and Recommendation.

### 2. *Post-Miranda Statements*

Defendant McManaman also objects to Judge Zoss's finding that the statements made by defendant McManaman several hours after his arrest and after he was provided with *Miranda* warnings were not subject to suppression. Defendant McManaman claims that his post-*Miranda* statements must be excluded as fruit of the poisonous tree. However, the "fruit of the poisonous tree" doctrine does not operate in the *Miranda* context in the same way that it does in the Fourth Amendment context. *See United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion) ("fruit of the poisonous tree" doctrine does not apply to *Miranda* violations).

In *Oregon v. Elstad*, 470 U.S. 298 (1985), the defendant made incriminating statements while being arrested at his home in response to casual questioning which violated *Miranda* because no warnings had been given. Later, at the sheriff's office, the defendant after being advised of and waiving his *Miranda* rights, gave a full statement. The state appellate court held that the *Miranda* violation required suppression of the second statement. In reversing, the United States Supreme Court held that:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.

*Id.* at 314.

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court revisited the issue of midstream *Miranda* warnings. In *Seibert*, the Court considered "a police protocol for

17

custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession," followed by *Miranda* warnings and questioning intended to elicit the same confession. In *Seibert*, the Court distinguished *Elstad* and held that both confessions must be suppressed because of the initial Miranda violation. A four-judge plurality found that whether a statement taken after an initial *Miranda* violation would render a second statement inadmissible should be considered under a multi-factor test, considering: 1) the completeness and detail of the questions and answers in the first round of interrogation, 2) the overlapping content of the two statements, 3) the timing and setting of the first and the second confession, 4) the continuity of police personnel, and 5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615 (plurality opinion).[3]

Here, the court finds that defendant McManaman was not subjected to the two-step interrogation technique at issue in *Seibert*. At his home, defendant McManaman was asked only a single question without the benefit of *Miranda* warnings. The subject of his second questioning occurred at the Woodbury County Jail, several hours later, and was proceeded by defendant McManaman being advised of and waiving his *Miranda* rights. Moreover, the subject of his questioning at the Woodbury County Jail, which concerned the allegations in the indictment, was distinct from the questioning that had occurred at his home. Thus, under the facts of this case, the court concludes that an improper tactic was not employed and the questioning of defendant McManaman is governed by *Elstad* and not *Seibert*.

---

[3] Justice Kennedy, who supplied the decisive fifth vote, adopted a different test for determining when use of a two-step interrogation technique required suppression of statements made after the delayed *Miranda* warnings. *Id.* at 621-22 (Kennedy, J., concurring).

Defendant McManaman has not established that law enforcement authorities used coercion in eliciting his initial statement. In addition, he does not allege and has offered no evidence that the Miranda waiver he gave before his second statement was not knowing and voluntary, or in any way coerced. Given this set of facts, the court concludes that the initial *Miranda* violation did not require suppression of defendant McManaman's subsequent statements made after he had been advised of his *Miranda* rights. The court, therefore, overrules this objection to Judge Zoss's Report and Recommendation.

### *III. CONCLUSION*

Therefore, for the reasons set forth above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Report and Recommendation and **denies** defendant McManaman's motion to suppress.

**IT IS SO ORDERED.**

**DATED** this 3rd day of July, 2008.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA